UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| PABLO FERNANDEZ,<br><br>                        Plaintiff,<br><br>                        v.<br><br>THE CITY OF NEW YORK, NEW YORK, a municipal entity; Officer ALBERT J. MELINO, in his individual capacity; JACK ROE, as Administrator of the Estate of Detective MARK C. TEBBENS, in his individual capacity; Detective WILLIE PARSON, in his individual capacity; Manhattan District Attorney Investigators ANGEL L. GARCIA, STEPHAN MSHAR, TERRENCE QUINN, in their individual capacities, and OTHER AS-YET-UNKNOWN JOHN AND JANE DOE OFFICERS, DETECTIVES, INVESTIGATORS #1-10 & SUPERVISORS #11-12, in their individual capacities,<br><br>                        Defendants. | Case No.  _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Pablo Fernandez, by his attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Neufeld Scheck & Brustin LLP, alleges as follows:

## NATURE OF THE CLAIMS

1.      Plaintiff Pablo Fernandez—convicted of a murder that he did not commit and unjustly imprisoned for nearly 25 years in New York State correctional institutions—brings this action for damages pursuant to the United States and New York State constitutions, 42 U.S.C. § 1983, and New York state law.

2.      Mr. Fernandez emigrated to the United States from the Dominican Republic in 1991, when he was 18 years old, to live with his family in New York City.  Because the Defendants in this action fabricated a case against him to purport to solve a cold case, he was

1

arrested in 1995 for a murder he had nothing to do with, and wrongly convicted in 1996, when he was only 23 years old.  As a result of Defendants' wrongful conduct, Mr. Fernandez spent nearly all of his adult life incarcerated away from his family in some of the most dangerous and terrifying prisons in New York State, all the while knowing he was innocent.  By the time he was finally exonerated, he was 46 years old.

3.     The crime underlying this case took place in the NYPD's 30th Precinct on June 10, 1993, when a tall, thin, White or light-skinned Hispanic man in his mid-thirties or forties shot and killed a teenager named Ramon "Manny" Quintero on West 135th Street in uptown Manhattan.  A second victim, Henry Gomez, was wounded but survived.  The gunman, who wore his gray hair in a ponytail, arrived by car, stepped out of the passenger side and fired several shots, returned to the vehicle and was driven away from the scene.

4.     A number of eyewitnesses saw the shooting, which took place in daylight, and officers from the 30th Precinct of the New York City Police Department interviewed some of them that evening and in the days that followed.  At that time, all of the witnesses described the shooter's appearance clearly and consistently: a white or light-skinned man in his thirties or forties, with a tall, thin build and gray hair pulled back in a ponytail.  Mr. Fernandez's appearance was the opposite.  He was, and is, a dark-skinned man, who, when the crime occurred in 1993, was 20 years old with a stocky build and short, dark hair.  Mr. Fernandez had nothing to do with Quintero's murder, and did not even know who Quintero was until years after the murder, when he was falsely charged with killing him.  To this day, the person who actually killed Quintero has never been apprehended for that crime.

5.     In the weeks after Quintero's murder, the NYPD began an investigation. But, consistent with well-documented and admitted practice in the 30th Precinct at the time, the

initial assigned officers, including Defendant Willie Parson, intentionally failed to follow up on important leads, either because they were actively covering up for known drug dealers, or because they knew a legitimate investigation risked implicating a suspect connected to drug dealers with whom the Precinct had corrupt ties, or because they simply intentionally disregarded their investigative responsibilities to pursue their own corrupt motives.

6. Approximately two years later, long after the case had gone cold, a second set of NYPD officers embarked on a brazen, corrupt scheme to frame Mr. Fernandez for the crime. Undeterred that (a) Mr. Fernandez bore no resemblance to the man who shot Quintero, (b) there was no physical, forensic, or ballistics evidence connecting him to the crime, and (c) there was no conceivable motive for him to have committed the homicide, the Defendants built a case against Mr. Fernandez that was based on testimony they and their witnesses knew to be false.

7. The primary architects of the plot to falsely incriminate Mr. Fernandez were NYPD Officer Albert "A.J." Melino and Detective Mark C. Tebbens, assisted by other Defendants. These officers, detectives and investigators built the fraudulent case against Mr. Fernandez through corruption, including policies, procedures and practices the City of New York has admitted were widespread throughout the NYPD in the decade leading up to Mr. Fernandez's conviction. Those policies, procedures and practices included habitually fabricating evidence, committing perjury in felony cases, pressuring witnesses and informants to lie, dealing drugs, misusing their police authority to protect drug dealers, and burying evidence of their official misconduct. Those practices were possible in this case and others because of a widespread breakdown in supervision and discipline to prevent corruption throughout the NYPD in the mid-1980s and 1990s, from the rank-and-file through senior leadership.

8.     The Mollen Commission, which Mayor David Dinkins created by Executive Order in 1992, spent 22 months between 1992 and 1994 studying police corruption in the NYPD, including reviewing thousands of department documents and case files, conducting hundreds of private hearings and interviews, and holding two weeks of public hearings.  That investigation led to a 270-page report memorializing the Commission's findings and providing additional notice to City leadership of the pattern of corruption described above. The City, through its officials, including the Mayor, and the Speaker of the City Council, reviewed and publicly endorsed the Commission's findings.

9.     The Mollen Commission's investigation resulted in the arrests and convictions of dozens of NYPD officers from the 30th Precinct and other precincts.  Many of those officers, including those involved in the Quintero homicide investigation, were convicted of serious felonies, including drug trafficking, robbery and perjury, among other crimes.  Separate from the prosecutions arising out of the Mollen Commission's investigation, after Mr. Fernandez's conviction, Melino was arrested and charged with three felonies relating to sales of large amounts of cocaine, including sales made the year before the Quintero homicide.

10.     In the 1990s, the NYPD's corrupt practices included the use of plainly unreliable informants; the use of suggestive and coercive techniques in interviews and interrogations to obtain false witness statements and identifications; the intentional failure to conduct adequate investigations of crimes; and the concealment of exculpatory information and wrongdoing by law enforcement.  During this time period, the NYPD frequently extracted false statements from informants and witnesses by promising leniency or threatening prosecution to induce the informant or witness to make a particular statement, and withholding this information from prosecutors and defense counsel.  It was also a widespread NYPD practice to feed a witness

details about how detectives believed the crime had been committed, and then misrepresent to prosecutors that those details had originated with the witness.  Further, NYPD officers regularly instructed informants and witnesses to falsely identify an innocent person as the culprit, whether from a lineup, photo array, or in the course of giving a statement.  The NYPD often used such tactics to "solve" cases, including ones that had gone cold, without doing the difficult investigative work that would have been necessary to find the real culprits.

11.     Dozens of criminal convictions manufactured by the NYPD in the 1990s have been overturned because of corruption, but not before innocent people, like Mr. Fernandez, spent decades in prison for crimes that they had not committed.

12.     Officer Melino, Detective Tebbens and other Defendants used unlawful tactics commonly in use in the NYPD to fabricate the case against Mr. Fernandez.  To that end, these Defendants pressured two vulnerable teenage eyewitnesses into falsely identifying Mr. Fernandez as Quintero's shooter.  In April 1995, Melino and Manhattan District Attorney's Investigator Angel L. Garcia approached two of Quintero's teenage cousins, Hickliff and George Rosario.  Both Hickliff and George had previously in June 1993 (within a day of the shooting) provided accurate descriptions of the gunman to the NYPD as a very light-skinned man in his mid-thirties with a gray ponytail.  Although their contemporaneous statements described a man who looked nothing like Mr. Fernandez, in April 1995, Melino and Garcia used direct suggestion and pressure to get the Rosarios to falsely identify Mr. Fernandez as their cousin's killer.  Although Hickliff was positive that Mr. Fernandez had not shot Quintero and George never saw the shooter's face, both teenagers ultimately acquiesced and falsely identified Mr. Fernandez due to that suggestion and pressure.

13.     In 1995, Melino, Tebbens and/or other Defendants conspired with two unreliable informants, Armando "Martin" Mejias and Raymond Rivera to make false statements purporting to incriminate Mr. Fernandez. Mejias was the leader of the Yellow Top Crew, or YTC, a violent crack-selling gang, and Rivera was one of the YTC's members. By 1994, Rivera by his own admission had committed more than 500 felonies, including assaults, robberies, and attempted murder. In June 1994, Mejias was charged with three counts of murder, one count of attempted murder, and multiple drug conspiracy charges. Both Mejias and Rivera obtained deals granting them leniency in exchange for information that helped the NYPD close, or pretend to close, drug-related crimes, including murders. Melino and Tebbens ensured continued cooperation from Mejias by supplying him with alcohol, cigarettes, drugs and other gifts, entertaining him in bars and restaurants, and taking him to meet women for sex—all while he should have been in jail.

14.     Either because of personal animus toward Mr. Fernandez or because Mr. Fernandez spent time in the area and was viewed as an easy target, Melino, Tebbens, Mejias and Rivera conspired to frame Mr. Fernandez. Although neither Mejias nor Rivera witnessed Quintero's shooting, Melino and Tebbens directed them to advance a fabricated story that Mr. Fernandez had been paid money by a drug dealer to shoot Quintero.

15.     In addition, to help explain away the fact that Mr. Fernandez bore no resemblance to contemporaneous eyewitness descriptions of the shooter, Melino and Tebbens conspired with these informants to fabricate evidence that Mr. Fernandez had disguised his appearance shortly before he purportedly shot Quintero, either by dyeing his hair or wearing a wig, all of which was false. To that end, for example, Rivera falsely claimed he had seen Mr. Fernandez wearing disguises in Manhattan in the weeks before the shooting, during a time when in fact Rivera was incarcerated in state prison more than 300 miles away.

16.     Due to the corrupt tactics employed by Melino, Tebbens and other Defendants, Mr. Fernandez was arrested and charged with the Quintero homicide in July 1995, even though he had nothing to do with the crime and looked nothing like the real perpetrator.

17.     Even with their fabricated evidence, Defendants recognized that their case against Mr. Fernandez was weak. As Mr. Fernandez's January 1996 trial approached, Melino and Tebbens fabricated more evidence against him.  Just weeks before the trial began, they conducted a "recanvas" of the neighborhood where Quintero was shot and found two additional eyewitnesses. One of them was Jesus Canela, who was only about 17 years old at the time and only about 15 years old when he witnessed the murder.  Melino and Tebbens used direct suggestion to induce Canela to falsely incriminate Mr. Fernandez in his trial testimony, including repeatedly showing Canela photos of Mr. Fernandez and telling him Mr. Fernandez was the shooter and where Mr. Fernandez would be sitting in the courtroom, then concealing this improper suggestion from the defense.  Upon information and belief, Melino and Tebbens also used similar direct and/or indirect suggestion to obtain another false identification from Manny Medina, who had not seen the murder take place but claimed to have observed the passenger in the getaway car.

18.     In February 1996, as a result of the NYPD's brazen misconduct, Mr. Fernandez was convicted of second-degree murder and sentenced to an indeterminate sentence of 25 years to life.

19.     At all times following his conviction, Mr. Fernandez maintained his innocence and fought to overturn his conviction through appeals in state and federal courts. Because Defendants had fabricated so much false evidence against him, and because they continued to actively conceal their own corruption and misrepresent that they had committed no misconduct, it took more than 23 years for him to be exonerated.

20.     Ultimately, Defendants' misconduct with the informants came to light, and witnesses, including Hickliff Rosario, George Rosario and Jesus Canela, came forward to explain that they could not identify Mr. Fernandez as the shooter and only did so because of police suggestion and pressure.  Additional witness accounts the jury never heard, too, proved that Mr. Fernandez was not the shooter.

21.     In February 2019, the United States Court of Appeals for the Second Circuit reversed Mr. Fernandez's conviction as unconstitutional, based on the fact that it was procured through false, fabricated evidence.

22.     The Manhattan District Attorney conducted additional investigation after the Second Circuit's ruling and uncovered additional proof of investigative misconduct and innocence, including proof that Rivera had been incarcerated more than 300 miles away from New York City during the time he claimed to have seen Mr. Fernandez in Manhattan, that Mejias had told Melino and Tebbens that Rivera was lying, and that Melino and Tebbens had supplied Mejias with alcohol, drugs, and other gifts.  In addition, the DA's investigators contacted an eyewitness to the shooting who had not previously been interviewed, and after being shown a double-blind photo array that included Mr. Fernandez's photograph, the eyewitness stated that a photo of Quintero's shooter was *not* among the photos she reviewed.

23.     In September 2019, based on the DA's unopposed motion, the court dismissed the 1995 indictment against Mr. Fernandez, and he walked out of court a free man.

24.     Although Mr. Fernandez has finally been freed, he never should have been prosecuted, let alone wrongly convicted.  There was never a shred of credible evidence to suggest that Mr. Fernandez committed the Quintero murder. But for Defendants' pervasive misconduct, he never would have been convicted.  Through this civil rights action, Mr. Fernandez seeks to hold

Defendants accountable for their misconduct and  seeks recompense for the nearly 25 years of his life lost as a result of his unjust conviction, as well as other damages he suffered during that time, including physical injuries and mental trauma.

## JURISDICTION AND VENUE

25.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Pablo Fernandez's rights as secured by the United States Constitution.

26.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343.

27.     Supplemental jurisdiction over Mr. Fernandez's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

28.     Mr. Fernandez has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Corporation Counsel of the City of New York, the Comptroller of the City of New York, and the County Clerk of New York County on December 10, 2019, within the time required by New York General Municipal Law Section 50-e.  More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

29.     At the request of the City of New York, Mr. Fernandez submitted to a hearing pursuant to New York General Municipal Law Section 50-b on September 24, 2020.

30.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York, the judicial district in which the claims arose.

**JURY DEMAND**

31.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

**PARTIES**

32.     Plaintiff Pablo Fernandez is and was at all times relevant to this Complaint a legal permanent resident of the United States, and a domiciliary and resident of the State of New York.  He currently lives in Yonkers, New York.

33.     Defendant City of New York was and is a municipality that is a political subdivision of the State of New York, was the employer of the individual Detective, Officer, and Investigator Defendants and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD") and the Manhattan District Attorney's Office ("Manhattan DA").

34.     Defendant Albert "A.J." Melino was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is sued in his individual capacity.

35.     Defendant Jack Roe, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "Jack Roe," is the Administrator of the Estate of Mark C. Tebbens, who is deceased. Mark C. Tebbens was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of

10

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Based on information and belief, Tebbens and/or Jack Roe, as Administrator of the Estate of Mark C. Tebbens, is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  Jack Roe, as Administrator of the Estate of Mark C. Tebbens, is sued for the acts and omissions of Mark C. Tebbens undertaken in his individual capacity.

36.     Defendant Willie Parson was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is sued in his individual capacity.

37.     Defendant Angel L. Garcia was at all times relevant to this Complaint a duly appointed and acting Investigator of the Manhattan DA, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is sued in his individual capacity.

38.     Defendant Stephan Mshar was at all times relevant to this Complaint a duly appointed and acting Assistant Supervising Investigator of the Manhattan DA, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of

New York.  Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is sued in his individual capacity.

39.     Defendant Terrence ("Terry") Quinn was at all times relevant to this Complaint a duly appointed and acting Supervising Investigator of the Manhattan DA, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Based on information and belief, he is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is sued in his individual capacity.

40.     Defendant Does #1 through 12, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, investigators, supervisors, and/or other agents and employees of the NYPD or Manhattan DA, acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein.  Based on information and belief, they are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

## FACTS

### MANNY QUINTERO'S HOMICIDE

41.     On June 10, 1993, at approximately 6:30 p.m., Ramon "Manny" Quintero was standing outside near 504 West 135th Street in Manhattan when a car pulled up.  A light-skinned man with a thin build and a gray ponytail wielding a machine pistol exited from the passenger-side of the car and shot Quintero multiple times, killing him.  Henry Gomez, who was

standing next to Quintero, was also shot but survived.  Afterward, the gunman with the gray ponytail reentered the passenger side of the car, and the car drove away from the scene.

42.    Pablo Fernandez was not present for the crime, had no involvement whatsoever in the murder of Quintero, and bears no resemblance to the true perpetrator.  The shooting took place on a New York City block in broad daylight.  At the time of the crime, numerous eyewitnesses accurately described the man who killed Quintero as a white or very light-skinned man in his thirties or forties, with a thin build and gray hair pulled back in a ponytail.  In contrast, Mr. Fernandez is a dark-skinned man and, at the time of the crime, was 20 years old, with a stocky build and short, dark hair.

### INVESTIGATION AND FABRICATION OF EVIDENCE

43.    The Quintero murder was initially investigated by the NYPD's 30th Precinct.  At the time of the Quintero investigation, the 30th Precinct was rife with official misconduct and corruption, so much so that it earned the nickname the "Dirty Thirty."  Many of the precinct's officers—including the lead investigators in the Quintero homicide—abused their power to engage in robbery, drug selling and trafficking, extortion, and other crimes.  Supervisors in the 30th Precinct were aware of or willfully blind to this corruption and criminality and did nothing to discourage it.  Rather, supervisors encouraged officers not to get caught.

44.    Before, during, and after the Quintero homicide investigation, many of the same 30th Precinct officers who responded to and investigated the crime were engaged in drug trafficking and other related serious felony crimes.

45.    Willie Parson—the lead detective on the Quintero homicide in 1993—routinely ferried cocaine, heroin, and large amounts of drug money across the country on behalf of a drug ring based not far from where the Quintero murder occurred.

46.     Another officer active in the early stages of the case, Alfonso Compres, collected about $2,000 a week from drug dealers operating within the 30th precinct during the time period he was investigating this case.  Dealers would leave illegal cash payments for Compres in a Harlem bodega in exchange for Compres using his police authority to protect them from the law. Compres frequently beat up drug dealers who did not pay him protection money, which earned him the nickname Abusador, or Abuser on his beat.  Compres was so comfortable committing flagrant corruption that he used his service revolver to shoot a dealer while stealing a package of cocaine while in uniform.

47.     Henry Delarosa—who also responded to the Quintero crime scene on June 10, 1993—was later found to have made false statements in connection with an arrest made in 1993, and was dismissed from the police force in 1995 or 1996.

48.     James Velez—another officer who responded to the Quintero crime scene that day—was arrested in 1995 for allegedly conducting an illegal search at a known drug location and later lying about it.  Ultimately, Velez was convicted of three counts of perjury and dismissed from the police force.

49.     The Mollen Commission conducted a two-year sting operation into corruption in the 30th precinct which, by 1995, had implicated one of every six of the 192 officers assigned to the precinct in corruption related to the drug trade.  Then-Police Commissioner Bratton admitted that the corruption in the Precinct was so widespread that other officers should have reported their colleagues.

50.     The Commission's investigation ultimately led to the convictions of 33 officers for drug dealing, robbery and perjury.  Prosecutors were forced to throw out 125 cases

against 98 defendants after determining their convictions were based on untruthful testimony by 30th Precinct officers—more than any other prior police perjury case.

51.     For years prior to the investigation in this case, the NYPD had failed to follow up on citizen complaints about a widespread pattern of corruption and physical abuse in the 30th Precinct.  For example, an individual named Edward Thompson reported that Compres had punched him while making racial slurs during a December 1991 arrest.  Even after an appeals court threw out Thompson's case in 1992 the Police Department did not investigate Compres for misconduct or ensure that he received any additional supervision to deter him from engaging in corruption.

52.     The pattern of complaints like Thompson's, in addition to the widespread, brazen nature of the ongoing corruption and the proliferation of the drug trade in particular areas of the City including the 30th precinct, put City policymakers on notice of corruption, including corruption related to the drug trade, within its ranks.  Indeed, Corruption was so rampant in the 30th Precinct that officers continued openly engaging in illegal conduct after major news outlets reported that law-enforcement agencies were investigating the precinct.  Officers in the station house openly joked about getting caught in response to reports of police corruption uncovered by the Commission in other parts of the City.

53.     In August 1993, the New York Times reported "Law-enforcement officials are investigating two groups of New York City police officers who are suspected of running separate drug-trafficking operations . . . The 30th Precinct investigation revolves around suspicions that a group of officers was on the payroll of drug gangs, providing them with information and protection to avoid arrests and stealing drugs from rival gangs."  Still, officers continued to engage

in corruption undeterred, and supervisors in the precinct failed to adequately supervise officers to deter corruption.

54.     Finally, Officer Melino—who re-opened the Quintero investigation years after it went cold—was also charged with drug crimes, independent of the Mollen Commission's investigation.  After Mr. Fernandez's conviction, Melino was arrested and charged with three A-1 felonies—two counts of criminal sale of a controlled substance in the first degree and one count of criminal possession of a controlled substance in the first degree—each of which carried a minimum sentence of fifteen years, for supplying cocaine to an upstate drug ring, selling half a kilogram of cocaine to an individual who intended to transport the narcotics to an upstate location in 1991, and negotiating the sale of a further kilogram of cocaine for $20,000 to an undercover state trooper in 1992.  Melino was subsequently dismissed from the police force.[1]

### Eyewitnesses Describe a Shooter Who Looked Nothing like Mr. Fernandez

55.     Because the shooting happened in broad daylight on a busy street, a number of witnesses observed the shooter.  Around 6:30 p.m. on June 10, 1993, anonymous eyewitnesses began to call 911 to report the shooting of Ramon Quintero and consistently and accurately described the shooter as a man in his mid-thirties or forties with white or very light skin and gray hair.  One 911 caller described the shooter as "LT SKN ML ABT 6 FT . . . GRY HAIR . . . IN HIS FORTYS"; another 911 caller described the shooter as a man with  "GRY HAIR W A TAIL." Within the hour, police officers from the 30th Precinct arrived at the scene, including Detective Parson and Officers Compres, Delarosa, and Velez.

---

[1]  Based on information and belief, the NYPD failed to immediately or adequately investigate whether Officer Melino had committed misconduct while on the police force, including whether Officer Melino had improperly pressured, urged, or coerced false witness statements and evidence.

56.     At the scene, Detective Parson spoke to Quintero's 13-year-old cousin Hickliff Rosario and directed a detective to take Hickliff to the 30th Precinct that night.  Hickliff described the shooter to Detective Patrick Heaney as a white Hispanic male, about thirty-five years old, with a thin build, graying hair, and a small ponytail. Hickliff signed a written statement including that description, which was reported to Parson.

57.     Parson also directed a detective to take Hickliff to view photographs of potential suspects at the NYPD's CATCH unit.  Hickliff selected as a "lookalike" a photograph of an older light-skinned male, who, like Hickliff's description given contemporaneously with the crime, bears no resemblance to Mr. Fernandez.  Hickliff stated that the only difference between the photograph of the "lookalike" and the shooter was that the hair should be pulled back in a ponytail and gray instead of dark.

58.      Either Parson intentionally failed to take any steps to investigate the individual Hickliff suggested, or they did investigate him and intentionally failed to document that investigation in order to cover up his culpability in connection with their corrupt relationships with known drug dealers.

59.     The next day, on June 11, Detective Parson questioned 13-year-old George Rosario.  George, a cousin of both Hickliff and Quintero, was so distraught by witnessing his cousin's murder that he punched a glass door, and he was subsequently admitted to a hospital for the resulting injuries.  At the hospital, George told Detective Parson that although he had witnessed the crime, he "only saw a side view of the [shooter]."  Similarly to Hickliff, George described the shooter as "very light skinned," "about 6'0"/175 lbs," and with "grey hair that was pulled back into a ponytail."  Parson scheduled a date for George Rosario to view photographs at the C.A.T.C.H. Unit, but failed to take him, either because Parson was intentionally trying to cover up

for a known drug-connected suspect, because Parson was intentionally ignoring his investigative responsibilities in order to pursue his own corrupt motives, or because Parson was intentionally not conducting a legitimate investigation because of the risk that basic investigation would lead to a suspect connected to a known drug dealer with whom he or other detective in the 30th precinct had corrupt ties. Even if George went, on his own volition, to the 30th Precinct a few days later, after he was released from the hospital, there are no police records documenting that visit.

**In the Immediate Aftermath of the Crime, NYPD Officers Conduct an Intentionally Inadequate Investigation and Fail to Follow Obvious Leads**

60. Despite many leads from 911 callers and the Rosario cousins, Detective Parson's investigation went cold after only a few days due to the NYPD's intentional failure to conduct an adequate investigation.

61. Either because they were actively covering up for known drug dealers, or because they intentionally disregarded their investigative responsibilities in order to pursue their own corrupt motives, the investigators initially assigned to the Quintero homicide, including Defendant Parson, failed to conduct basic investigative steps that could have led to the apprehension of the true perpetrators and prevented Mr. Fernandez's wrongful conviction.

62. For example, anonymous 911 callers provided officers with names of potential suspects, possible license plates of a getaway car, and a possible motive for the Quintero homicide. The day after the shooting, an anonymous female caller reported that the actual target was a relative of Quintero's who looked like him. There are no police reports indicating that this lead was ever investigated or that the possible target was ever interviewed.

63. The caller also provided the police with a possible license plate number of the getaway car. The license plate number matched a tan Toyota Corolla—the same make of a car that numerous eyewitnesses had reported. Detective Parson testified at trial that the NYPD

"ran the name of the person through our records check and we got, you know, we got a photo of the person." However, Parson stated that the person "didn't really fit the description of what we had been getting as the person who did the shooting." There are no police records indicating that the person to whom the car was registered was ever interviewed or questioned in connection with the Quintero homicide, despite the fact that the getaway driver was still at large, and thus the fact that the owner of the car didn't match the description of the shooter did not exclude him.

64.    Also on June 11, 1993, another anonymous 911 caller reported the name of a possible suspect with an address. Upon receipt of the call, an officer confirmed the address of the person identified by the 911 caller. Although Parson later admitted that he was familiar with the person identified from having "seen him in the street," there are no police records indicating that the person identified was ever interviewed or questioned in connection with the Quintero homicide.

65.    The day after the shooting, Detectives conducted a canvas and documented that they "met with negative results due to the fact [that] some could not speak English, some were not at home and the ones available could offer nothing of value."

66.    Defendant Parson intentionally failed to take the basic, obvious step of following up on the first, and apparently only, day of canvassing for witnesses. Specifically, there is no evidence that, in the days, weeks, or months after the Quintero homicide, detectives returned to the scene of the crime to speak with neighbors who were not home on June 11, 1993. Nor is there any record of officers returning with an interpreter to speak to potential eyewitnesses who did not speak English.

67.    Defendant officers also either failed to interview other eyewitnesses whose identities were known to them or otherwise readily ascertainable or, if they did conduct these

interviews, failed to record any of the results.  Had the police pursued other leads and properly investigated Mr. Quintero's murder, they could have identified other eyewitness whose accounts, had they been properly obtained and documented, could have proven Mr. Fernandez's innocence. These investigative failures are so extensive and so basic as to suggest police were intentionally avoiding gathering evidence that would lead to the shooter.

68.     To begin with, NYPD officers failed to adequately interview or investigate leads from the second victim of the shooting, Henry Gomez.  After he was shot, Gomez was admitted to Columbia Presbyterian Hospital, where he remained for three days.  Detective Parson and/or another officer visited the hospital and spoke with Gomez the day after the shooting. Consistent with the other witness descriptions, Gomez described the gunman as a light-skinned person.  Officers asked Gomez to contact them when he was discharged from the hospital, but not wanting to be involved, he did not do so.  Although Gomez was the victim of the crime and would have been easy to locate, the Defendant Officers failed to re-interview him at any point before the case went cold.

69.     Defendants also failed to interview Evarista Santana-Diaz, an eyewitness who had a clear view of the shooter.  In 2019, an Investigator for the Manhattan DA's office showed Ms. Santana-Diaz a double-blind photo array (including Mr. Fernandez's photograph). She was "unable to make an identification" at that time.  Subsequently, she told the DA's Office that the shooter was not among the photographs she viewed in the photo array.

70.     Defendant officers, including Parson,  also intentionally failed to conduct any investigation into the identity of the shooter's accomplice who drove the getaway car, despite that being a basic investigative step they would have known was required.

**Officers and Investigators Fabricate Statements and Suppress Exculpatory Evidence from Martin Mejias and Raymond Rivera**

71.     In late 1994 or early 1995, more than a year after Quintero's shooting, Officer Melino, then assigned to the Homicide Unit of the Manhattan DA's Office, took over investigation of the case, assisted by Detective Tebbens and Investigator Garcia.

72.     Supervising Investigators Stephan Mshar and Terry Quinn supervised Melino, Tebbens, and Garcia in all aspects of their investigation.  Either Mshar and Quinn were aware or their investigative misconduct, or they were willfully blind to and therefore permitted it.

73.     Around the time Melino became involved with this case, Melino's assignments included investigating and arresting members of the Yellow Top Crew drug gang.  He had been with the police force for less than two years.  Six months before he entered the police academy in June 1992, Melino was distributing cocaine.  Upon information and belief, at the time of his involvement in the Quintero investigation Melino was selling drugs and otherwise engaging in corruption related to the drug trade.

74.     From 1994 to 1996, Melino and Tebbens were working with two unreliable informants, Martin Mejias and Raymond Rivera, in a purported effort to solve drug-related crimes that had taken place in Upper Manhattan.  Melino and Tebbens used Mejias and Rivera to fabricate evidence falsely implicating Mr. Fernandez in Quintero's murder.

75.     Supervising Investigator Stephan Mshar also worked on the YTC investigation and worked closely with Mejias.  During the course of this investigation, Mshar interviewed Mejias between 15 and 20 times.

76.     Mejias was the leader of the YTC drug gang and Rivera was one of the gang's members.  In June 1994, Mejias was charged with three counts of murder, one count of attempted murder, and multiple drug conspiracy charges, and was facing the possibility of life

imprisonment if convicted. Mejias agreed to provide information to law enforcement on drug-related crimes, including murders, in exchange for leniency. Ultimately, he was incarcerated for approximately 15 years before he was paroled.

77. Rivera also entered into a cooperation with the Manhattan DA's Office. In or about 1994, he admitted to the Manhattan DA's Office that he had committed more than 500 felonies, including assaults, robberies, and attempted murder. But he was not prosecuted for any of those crimes in exchange for agreeing to provide information on other drug-related crimes. At the time they were helping to frame Mr. Fernandez for the Quintero murder, Mejias and Rivera were hopelessly dependent on pleasing their handlers in the NYPD. At the time he was assisting in the prosecution of Mr. Fernandez, Mejias was anxious to complete his cooperation agreement. Mejias was motivated to help Tebbens because Tebbens had helped him, and understood that by assisting in the investigation he was "providing [Tebbens] with the opportunity for more income" and "major overtime."

78. Indeed, both said whatever Melino and Tebbens told them to say about Mr. Fernandez.

79. Melino and Tebbens engaged in brazen misconduct in connection with their relationship with Mejias and Rivera during this investigation. Among other things:

> (a) Melino and Tebbens told Mejias and Rivera to lie in order to plausibly implicate Mr. Fernandez in the Quintero homicide investigation.

> (b) At times when he should have been in jail awaiting sentencing, Mejias instead spent time "chilling," "uncuffed" with Melino and

Tebbens, who entertained him throughout the city at bars and restaurants, and took him to meet women so he could have sex.

(c)     Melino and Tebbens secretly supplied Mejias with numerous gifts and benefits, including alcohol, cigarettes, meals, and drugs to sell in jail.

(d)     Mejias told the officers that Rivera "was a liar & telling lies in [Mr. Fernandez's] case."   In response, Melino laughed and Tebbens responded that Rivera was "doing a great job."

(e)     Mejias had a serious drinking problem around the time of Mr. Fernandez's trial—so serious that he had to drink every day—and he was drunk on the witness stand when he testified against Mr. Fernandez.

(f)     Melino confessed to Mejias that he had sold cocaine.

80.     Neither Mejias nor Rivera witnessed Quintero's shooting, but they coordinated with Melino and Tebbens to concoct a false story that Jose Luis Marte, the recently-deceased leader of another drug gang, had hired Mr. Fernandez to kill Quintero.  According to the story, Marte had murdered a relative of Quintero's and subsequently hired Mr. Fernandez to kill Quintero because he feared retaliation.

81.     At Mr. Fernandez's trial, Mejias falsely testified that Marte told him he had hired Mr. Fernandez to kill Quintero and that Mejias had observed Marte paying Mr. Fernandez for Quintero's murder approximately a month after the crime.  Similarly, Rivera falsely testified that he had observed Mr. Fernandez in Manhattan in the days before the shooting and that he met with Mr. Fernandez and Marte after the shooting, at which point Mr. Fernandez confessed to killing

Quintero.  This entire account was false and fabricated.  Mr. Fernandez is innocent; he had nothing to do with the Quintero homicide.  Marte never approached Mr. Fernandez about killing Quintero, nor paid Mr. Fernandez to kill anyone.  And Mr. Fernandez never confessed to having anything to do with the Quintero homicide because he had no involvement in the killing nor any connection to Quintero or his killers.

82.    The only reason Mejias and Rivera implicated Mr. Fernandez was because Melino and Tebbens told them what to say.  But Melino and Tebbens falsely reported to the prosecution in written and oral reports that Mejias's and Rivera's accounts originated with them, and not with the officers.

83.    Indeed, as the DA's Office disclosed to counsel for Mr. Fernandez in 2019, prison records show that Rivera was incarcerated in state prison in Watertown, New York, more than 300 miles from New York City, for much of 1993, and was released from prison on June 10, 1993, the day of the Quintero murder.  In other words, Rivera's testimony that he observed Mr. Fernandez in Manhattan in the days and weeks before the shooting, which was critical to the prosecution's case, is demonstrably false.

84.    The fabricated account from Mejias and Rivera was the only evidence in the case against Mr. Fernandez that purported to provide a motive for the killing of Quintero.  The trial prosecutor, Assistant District Attorney Deborah Hickey, repeatedly relied on this fabricated evidence of motive to persuade the jury to convict Mr. Fernandez.  In her opening statement, Hickey told the jury that they would "hear from the voice of the man who ordered Manny killed, Jose Louis Marte" through the testimony of Mejias and Rivera.  And in her summation, she told the jury that although the "eyewitnesses can tell you what and who," Mejias and Rivera "can tell

you why."  She returned to this argument to argue: "[C]onsider that they are the people that are best able to tell you, the only people able to tell you the why.  And the how."

85.     In addition, at Melino and Tebbens's behest, Mejias and Rivera provided false evidence to explain away a glaring hole in the prosecution's case: that Mr. Fernandez bore no resemblance to contemporaneous eyewitness descriptions of the shooter as having gray hair with a ponytail.  For example, Mejias testified falsely that he saw Mr. Fernandez wear his hair in a ponytail approximately one week before the Quintero murder and that a can of "white or green" hairspray dye allegedly left over from the previous Halloween may have been used to color Mr. Fernandez's hair at the time of the murder.  Similarly, Rivera provided fictitious testimony that, in the weeks before the shooting, Mr. Fernandez's hair was its "natural color, sometimes he would paint it a different color, sometimes he would wear a wig," and that "[t]he day of the shooting, a couple of days before the shooting, he always had his little ponytail."  Rivera also falsely testified that Mr. Fernandez had salt and pepper hair before the Quintero shooting.

86.     In fact, Mr. Fernandez had black hair at the time of the shooting and has never dyed it with white, green, or any other color of hairspray.  Nor has he ever worn his hair long or in a ponytail, or worn a wig.

### Officers and Investigators Fabricate Statements and Suppress Exculpatory Evidence from Hickliff Rosario and George Rosario

87.     In addition to using Mejias and Rivera to concoct a fabricated story implicating Mr. Fernandez in Quintero's murder, the NYPD elicited false statements and testimony from Hickliff and George Rosario, two vulnerable teenage eyewitnesses who were both cousins to Quintero.

88.     On April 4, 1995, Melino and Garcia met with Hickliff Rosario and showed him a photo array which included Mr. Fernandez's picture, although Mr. Fernandez did not in any

way match the description of the shooter as a white, older, gray-haired man that Hickliff had provided to police two years earlier.

89.     Melino used direct suggestion to pressure Hickliff to pick Mr. Fernandez, including by pointing to Mr. Fernandez's photo with his thumb and asking "It's him, right?" Hickliff, who was only 15 years old at the time, did not initially answer. Nevertheless, Melino continued to meet with Hickliff without any guardian present and repeatedly pressured him to identify Mr. Fernandez. Several times, Hickliff told Melino that the man in the photograph was *not* the shooter. Undeterred, Melino told Hickliff that "they knew [Mr. Fernandez] was the driver of the car, and not the shooter," and that "the driver was just as guilty of the crime as the shooter because he helped to commit the crime." Ultimately, Hickliff relented under the pressure and identified Mr. Fernandez as the perpetrator. As Hickliff admitted under oath years later, he did not believe Mr. Fernandez was the shooter but felt "brainwashed" and identified him as a result of Melino's direct suggestion.

90.     On April 5, 1995, Melino and Garcia met with Hickliff's cousin, George Rosario. George, like Hickliff, was only 15 years old at the time. He, too, had at the time of the shooting given a description of the gunman as a light-skinned gray-haired man. But Melino and/or Garcia showed George photographs of Mr. Fernandez and told him that Mr. Fernandez was guilty.

91.     When George responded by telling Melino and Garcia that the shooter had gray hair in a ponytail and did not look like Mr. Fernandez, the officers improperly suggested to George that the shooter could have changed his appearance to commit the crime. Ultimately, George gave in to the pressure and falsely identified Mr. Fernandez as the perpetrator. Years after Mr. Fernandez's wrongful conviction, however, George, just like his cousin Hickliff, admitted that he had only identified Mr. Fernandez falsely and as a result of the officers' direct suggestion.

George explained that he followed the improper suggestions because he "wanted to see [Mr. Fernandez] punished for what [he] thought [Mr. Fernandez] did to [his] cousin," based on what Melino and/or Garcia had told him.

92.     Melino and Garcia deliberately hid their suggestion and misrepresented in written and oral reports to the prosecution that the Rosarios had identified Mr. Fernandez through fair and proper identification procedures.

93.     On June 12, 1995, Melino bought breakfast and lunch for Hickliff and George Rosario and brought them to testify before the grand jury investigating the Quintero murder.  The Rosarios told the grand jury that they had identified Mr. Fernandez in photo arrays, even though they had not actually recognized Mr. Fernandez as the shooter.  The Rosarios did not disclose to the grand jury that Melino, Garcia, and/or other Defendants had directed and pressured them to falsely identify Mr. Fernandez in the photo arrays.

94.     Melino also testified before the grand jury.  He discussed showing Hickliff and George Rosario the photo arrays but did *not* disclose his misconduct to the grand jury.  For example, he did not admit that he had directed Hickliff and George to choose Mr. Fernandez's photograph when he showed them the photo arrays.

95.     The Rosarios' false identifications of Mr. Fernandez were the sole evidence supporting the grand jury indictment, and thus, Mr. Fernandez's wrongful imprisonment would not have occurred but for and did, in fact, occur as a direct result of the misconduct by Melino, Garcia, and/or other Defendants.

96.     Next, on July 20, 1995, Melino, Garcia and/or other Defendants orchestrated unduly suggestive lineups and exerted pressure to ensure that Hickliff and George again identified Mr. Fernandez as Quintero's shooter.  Senior Investigators Stephan Mshar and

Terry Quinn supervised the lineup.  That morning, Melino brought both teenagers, unaccompanied by an adult, to the Manhattan DA's Office.  Knowing that the Rosarios had not actually seen Mr. Fernandez commit the shooting because he was innocent and was not present at the crime scene, Melino knew there was a risk they would fail to identify him at the lineup.  So Melino took a Polaroid photos of Mr. Fernandez and, upon information and belief, showed it to the Rosarios before they viewed the lineups to ensure that they identified Mr. Fernandez.

97.    As a result of Defendants' improper pressure, direct suggestion, and unduly suggestive procedures, both Hickliff and George Rosario repeated their false identifications of Mr. Fernandez at the lineup.

98.    After the lineups, Melino and/or Garcia met with the Rosarios approximately nine times each prior to Mr. Fernandez's trial, including on August 17, August 22, December 18, December 29, 1995, and January 14, 1996, to ensure they would cooperate and identify Mr. Fernandez at trial.  Other than recording the dates and/or amounts for meal and movie ticket reimbursements in their memo books, neither Melino nor Garcia documented these meetings in any way.

99.    On the day that George testified at Mr. Fernandez's trial, Melino met with him before he took the witness stand, described the layout of the courtroom to him and told him that Mr. Fernandez would be wearing yellow to ensure he would falsely identify Mr. Fernandez at trial.  Subsequently, during his testimony, George identified Mr. Fernandez to the court as the man "wearing [a] yellow sweater."  Melino hid his misconduct from the prosecution.

**Officers and Investigators Fabricate Statements and Suppress Exculpatory Evidence from Jesus Canela and Manny Medina**

100.    Recognizing that their case was flimsy even with their fabricated evidence, Melino and Tebbens used misconduct to procure two more fabricated purported witness accounts before trial.

101.    On or around January 6, 1996, to prop up their fabricated case against Mr. Fernandez just before the trial was scheduled to begin, Melino and Tebbens purported to "recanvas" buildings near where the shooting had occurred to search for additional eyewitnesses.

102.    The first was Jesus Canela, a teenage friend of Quintero who reported witnessing part of the shooting through the window of a bus 12–15 feet away, but had not been interviewed by the police at the time of the crime.  Although Canela made it clear to Melino and Tebbens that he had only had an obstructed view of the shooter's face, Melino and Tebbens repeatedly showed him Mr. Fernandez's photograph and encouraged him to identify Mr. Fernandez as the shooter.  Canela told Melino and/or Tebbens that he could not identify the man in the photograph as the shooter because he had only briefly seen the shooter's face "from his nose to his chin," but the officers told Canela that they knew that the man in the photograph was Quintero's killer.  Canela eventually succumbed to the officers' undue pressure and improper tactics and falsely identified Mr. Fernandez as the shooter, first in a meeting with the police and then as a trial witness.

103.    Before he testified on the witness stand, the officers told Canela where Mr. Fernandez would be sitting in the courtroom so that he could falsely identify Mr. Fernandez as the shooter.  They further instructed Canela not to reveal their improper preparation of him when he testified in court.  As a result, Canela falsely identified Mr. Fernandez as the perpetrator at trial,

giving the jury the misleading impression that he was testifying based on his memory of rather than following secret instructions from the NYPD.

104.   Years after Mr. Fernandez's wrongful conviction, Canela explained under oath that his identification of Mr. Fernandez was false and the result of police pressure: "I was very afraid at that point. I had never been in so much pressure. . . . I did something I never should have done."  Canela also admitted:  "[T]here came a point where it was asked so many times where I said, you know what, if that's the person, then that's the person. . . .  I pretty much gave into saying it's obvious that [the officers] want me to point this person out, so I pointed the person out."  According to Canela, "[he] would not have identified Mr. Fernandez as the shooter if the officers had not shown [him] his photograph and told [him] that he was the man who had shot Manny."

105.   Melino and Tebbens also found eyewitness Manny Medina two weeks before Mr. Fernandez's trial.  Like Canela, Medina purported to identify Mr. Fernandez as the shooter in court at the trial.  He testified that he was approximately a block away when the shooting occurred, and that he did not witness the shooting, but saw a car emerging from the scene at low-speed.  Medina testified that he saw only the right profile of the passenger in the car.  On information and belief, Melino and/or Tebbens manipulated Medina into falsely implicating Mr. Fernandez as Quintero's shooter at trial using improper tactics similar to those they used with Canela.

106.   Had Mr. Medina actually seen the shooter, he would not have identified Mr. Fernandez from a fair identification procedure without suggestion from defendants, because Mr. Fernandez had nothing to do with the shooting and was not present at the crime scene.

107.    Both Canela's and Medina's purported eyewitness identifications of Mr. Fernandez were completely unreliable and impermissibly suggestive.   They were secretly orchestrated by Melino and Tebbens to bolster the other false testimony they had arranged.  Melino and Tebbens hid their misconduct and misrepresented to the prosecution that Canela's and Medina's identifications originated with the witnesses without suggestion or prompting.

**Defendants Intentionally Bury Exculpatory Evidence from Second Victim Henry Gomez**

108.    Like the original investigators in 1993, Melino and Tebbens initially failed to follow up with the second victim, Henry Gomez, to avoid undermining their case against Mr. Fernandez.  But prior to trial, Gomez came to the police station.  Defendant officers showed Gomez a photo array that presumably included Mr. Fernandez's picture. Because Mr. Fernandez is innocent and was not the man Gomez saw, he failed to identify him. The defendant officers intentionally failed to document their interactions with Gomez or the photo showing, and instead hid it from the prosecution and defense in order to protect their fabricated case and prevent their misconduct with other witnesses from being investigated and uncovered.

109.    Instead Detective Parson and Officer Melino conspired to create a false story that they were unable to locate Gomez, and misrepresented that to the prosecution to excuse their apparent investigatory failure.

110.    On the basis of that false story the Court denied the defense's request for a missing witness charge as to Gomez.

111.    In fact, Gomez had an unobstructed, clear view of the perpetrator who shot him, whom he described, consistent with the other witnesses' descriptions but inconsistent with Mr. Fernandez, as a white-skinned person with a ponytail. Because Mr. Fernandez is innocent and

was not the man Gomez saw, had he been called at trial he would have reported that Mr. Fernandez
was not the shooter. But because of the defendant officers' misconduct he was not.

## PROSECUTION AND WRONGFUL CONVICTION

### Mr. Fernandez's Trial

112.    Mr. Fernandez's trial for murder in the second degree began on January 16,
1996.

113.    The case against Mr. Fernandez relied almost entirely on the false
identifications from vulnerable teenage eyewitnesses (Hickliff and George Rosario, and Canela),
and the false and fabricated accounts from the two unreliable drug dealers motivated by
cooperation agreements (Mejias and Rivera), as well as the false reports of the two corrupt officers
who had manufactured inculpatory evidence and hid exculpatory evidence (Melino and Garcia).
Because he is innocent, no physical, ballistics or forensic evidence ever implicated Mr. Fernandez.
No murder weapon was ever recovered.

114.    Based on the officer defendants' misrepresentations that the identifications
were made fairly, without suggestion, from a proper six-person photo array, the prosecutor offered
the identification evidence and the court admitted it.

115.    The jury, however, did not know that the purported eyewitness
identifications were the product of suggestion and coercion.  Nor was the jury aware that the
testimony of the cooperators was false and fabricated to present the illusion that Mr. Fernandez
had a motive and that he had disguised himself to commit the crime.

116.    At trial, Mr. Fernandez maintained his innocence, and his defense sought to
establish that Mr. Fernandez did not fit the description of the shooter.  Mr. Fernandez called two
witnesses who testified they saw an older, gray-haired man at the scene, including one who knew
Mr. Fernandez and testified that he never saw Mr. Fernandez wear his hair in a ponytail.  A third

witness also testified that Mr. Fernandez never wore his hair in a ponytail.  The defense also introduced two photographs of Mr. Fernandez taken around the time of the shooting which showed that he had short dark hair, in contrast to the perpetrator.

117.    However, this evidence by Mr. Fernandez was not enough to overcome the false evidence procured and put on by the Defendant officers, and the jury never learned of the Defendant officers' misconduct.  On February 6, 1996, based on the false and fabricated evidence and testimony manufactured by the NYPD, the jury convicted Mr. Fernandez of murder in the second degree.  He was sentenced to 25 years to life in prison.

**Mr. Fernandez's Post-Conviction Proceedings Unearth New Evidence Proving His Innocence and Police Misconduct**

118.    After his wrongful conviction, Mr. Fernandez never stopped fighting to prove his innocence. Over a period of 16 years, from 2003 to 2019, he challenged his conviction in state post-conviction and federal *habeas* proceedings as newly-discovered evidence surfaced demonstrating his innocence.

119.    In particular, Hickliff Rosario, George Rosario and Jesus Canela came forward to explain that they could not identify Mr. Fernandez as the shooter, and only did so because of police suggestion and pressure.  Henry Gomez, too, reported that Mr. Fernandez was not the man who shot him and did not look like the perpetrator.  Even Mejias admitted to the District Attorney's office that Rivera lied in Mr. Fernandez's case (and that he told Melino and Tebbens as such) and described his own corrupt relationship with the officers.  Mejias subsequently told an investigator retained by defense counsel that Melino and Tebbens had "told [him] what to say and that's what [he] said at trial."

120.    Furthermore, Isabel Rosario, Hickliff's mother and George's aunt, told their family priest, Father Jose Clavero, that Hickliff and George had told her that they believed Mr.

Fernandez was innocent.  Father Clavero encouraged Hickliff and George to come forward with information of Mr. Fernandez's innocence.

121.   Mr. Fernandez filed two separate motions pursuant to C.P.L. 440.10, challenging his conviction, but Defendant officers continued to lie about the evidence in the case and their misconduct, and because of their continued misrepresentations, his motions were denied.

122.   Mr. Fernandez remained steadfast in fighting to prove his innocence and challenged his conviction in federal *habeas* proceedings.  On August 16, 2000, Mr. Fernandez first filed a petition, *pro se*, for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254, in the Southern District of New York.  Over the next decade, the petition was stayed pending exhaustion of state-court remedies.

123.   On August 30, 2013, after Mr. Fernandez had exhausted his state-court remedies, post-conviction counsel filed a third amended petition for a writ of *habeas corpus*.  On November 1, 2016, the federal district court denied the petition.  Mr. Fernandez appealed to the Second Circuit Court of Appeals.

124.   On February 5, 2019, the Second Circuit found that credible evidence of direct suggestion required the vacatur of Mr. Fernandez's conviction; the panel overturned Mr. Fernandez's conviction and remanded the case.

125.   On February 12, 2019, Judge Kimba Wood, in the Southern District of New York, issued an Order directing the State to inform the Court of any steps to retry Mr. Fernandez's case over the next 60 days.

126.   Beginning in early 2019, the Manhattan DA's Office conducted a reinvestigation of Quintero's murder.  That reinvestigation revealed additional exculpatory evidence confirming Mr. Fernandez's innocence.

127.    In particular, the DA's Office confirmed that Rivera was imprisoned in upstate New York at Watertown Correctional Facility during the time he claimed to see Fernandez, and interviewed Mejias, who admitted that he told Melino and Tebbens that Rivera's testimony was false and admitted other misconduct by Melino and Tebbens.

128.    The DA's office also located an eyewitness to Quintero's murder who had never previously been interviewed.  This eyewitness viewed a double-blind photo array that included Mr. Fernandez's photograph and confirmed that he was not the shooter.

129.    On May 16, 2019, the state trial court vacated Mr. Fernandez's murder conviction.

130.    On August 1, 2019, the state trial court granted Mr. Fernandez's application for bail.  Mr. Fernandez was released on $250,000 bond over $250,000 cash, subject to home detention with electronic monitoring.

131.    On August 21, 2019, the DA's Office, on its own motion, requested that the court remove all of Mr. Fernandez's bail restrictions and requested that all pre-trial motion practice be suspended pending a resolution of the case.  Both requests were granted.

132.    Finally, on September 13, 2019, the DA's Office filed a Recommendation of Dismissal, and the court dismissed the indictment against Mr. Fernandez. By the time of his release for incarceration, Mr. Fernandez had spent 23 years, 5 months, and 27 days in New York state prisons for a crime he did not commit.

## THE CITY OF NEW YORK'S POLICIES, PRACTICES, OR CUSTOMS

### Failure to Supervise and Discipline

133.    The rampant corruption described above was directly related to the NYPD's customs, policies, and practices of failing to adequately supervise or discipline NYPD officers and detectives in the 30th Precinct and other precincts.  Ultimately, as the Mollen Commission found,

the NYPD's unwillingness to address corruption "manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment."

134.    In the early 1990s, the NYPD recruited and hired as police officers individuals who should never have been hired for law enforcement, and that reckless hiring contributed to the rampant police corruption.  Indeed, the Mollen Commission concluded that of the over 400 officers who were dismissed or suspended for corruption in the five years prior to the release of its report, "a large number of them should never have been admitted to the Department—based solely on information in the officer's personnel file at the time of application."  Officers interviewed by the Mollen Commission also reported that they believed that "many people with questionable backgrounds and character are allowed to become their fellow officers because of political pressures to hire more and more police," and that "this practice dilutes the quality of their profession and leads to corruption."  Obviously, Officer Melino fits this description – as a cocaine dealer who had been investigated by New York State law enforcement, he should never have been hired by the NYPD.

135.    Once hired, recruits and officers did not receive adequate (if any) supervision to deter corruption.  Nor was training adequate.  For instance, as the Mollen Commission found, "integrity training at the Police Academy often relied on outdated materials . . . focused on corruption hazards like gambling pads that no longer exist, and was presented as an appendage to other 'more important' topics.  Further, some "[i]n-service integrity training" was never provided to recruits or officers despite being "required," and what was offered "was typically viewed by officers as boilerplate or mere prattle."

136.     The flagrant corruption within the NYPD before, during, and after this investigation was enabled by the willful ignorance—and even approval—of corruption and falsification of evidence by supervisors to such practices.   As the Mollen Commission's investigation found, there was "a widespread breakdown in supervision which fueled and protected the corruption" in the NYPD, and a widespread belief by supervisors that uprooting corruption was not part of their responsibilities.   "In fact, in every precinct where [the Commission] found corruption, [it] found ineffective or sparse supervision – and a willingness by certain supervisors to turn a blind eye to corruption which they knew or strongly suspected existed."   Further, there was a "critical shortage, and misallocation" of sergeants within the NYPD to effectively supervise their subordinates, and some sergeants were charged with supervising multiple, busy precincts, and others were tasked with administrative duties than precluded time in the field.

137.     This breakdown of supervision was particularly true in the 30th Precinct, in which supervisors failed to report any knowledge or suspicion about corruption to Internal Affairs. The Mollen Commission noted that it was "hard to believe that supervisors were ignorant of the corruption of their subordinates" in the 30th Precinct, and that, throughout the department, police falsifications were "widely tolerated" by officers and their supervisors.   For instance, when one field associate in the 30th Precinct provided the NYPD with "detailed information about extensive corruption in the precinct . . . nothing was done about it."

138.     Numerous officers also told Mollen Commission investigators that "they believed the Department did not want them to report corruption, that such information was often ignored, and that their careers would be ruined if they did so," and the Mollen Commission found that "[t]he evidence show[ed] that this belief was not unfounded."   At least one high-level commander in the 30th Precinct warned his officers against getting caught, rather than against

engaging in the actual wrongdoing.  Among other findings by the Mollen Commission were that officers who reported police misconduct to the Internal Affairs Division were "ostracized and harassed" for breaking the NYPD's "code of silence" and often become targets of complaints and physical threats by other officers – even despite assurances of confidentiality by Internal Affairs.

139.    The Commission not only blamed field supervisors for these failures but also placed blame squarely on NYPD management.  "[I]t [was] the Department's past Police Commissioners and top managers who, through their inaction and silence, permitted this situation to exist" by letting "supervisors off the hook" and letting "command accountability wither." Similarly, the Commission concluded that the "[NYPD's] top commanders must share the blame" for tolerating falsifications because "for years the [NYPD] was content to address allegations of perjury on a case-by-case basis, rather than pursuing the potential for a broader based investigation," and "supervisors were rarely, if ever, held accountable for the falsifications of their subordinates."

140.    Ultimately, the Mollen Commission concluded that the NYPD's purported mechanisms for dealing with corruption suffered from "two fundamental flaws," namely that there was no institutional mechanism in place to enforce command accountability, and that there was no institutional mechanism in place to oversee the Internal Affairs Division.

141.    These conclusions, which the City of New York has admitted, establish that at that time of the Quintero investigation and earlier, the City had a custom, policy, or practice of failing to properly supervise and discipline its officers and maintaining grossly inadequate mechanisms for identifying, monitoring, and disciplining police corruption and misconduct.  As a result, manipulation of witnesses and the fabrication of evidence against civilians ran rampant. The Mollen Commission correctly concluded that the NYPD's system of supervision and fighting

corruption had "virtually collapsed" and was "more likely to minimize or conceal corruption than uncover and uproot it" because of "a deep-seated institutional reluctance to uncover serious corruption."

### Misconduct in Homicide Investigations

142.    The City of New York, by and through its final policymakers, had in force and effect in the years prior to the Quintero murder investigation and through the investigation and wrongful prosecution of Pablo Fernandez, a policy, practice or custom of unconstitutional misconduct in homicide investigations, including in particular the use of plainly unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements and identifications; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.  The NYPD used such customs of misconduct to pretend to solve homicides, leading to scores of wrongful convictions, many of which have been overturned in recent years.  Such customs of misconduct were also frequently used to pretend to solve other serious felonies, including rapes, robberies and assaults.

143.    The NYPD's policy, practice, or custom of extracting false statements from informants and/or witnesses involved the use of various techniques, including, without limitation: promising leniency or threatening prosecution in order to induce the informant and/or witness to make a particular statement, and withholding this information from prosecutors and defense counsel; feeding the informant and/or witness facts about the crime, or about how the detectives believed the crime had been committed, and misrepresenting to prosecutors that those facts had originated with the informant/witness; suggesting to and/or instructing the informant and/or

witness to identify a particular person as the culprit, whether from a lineup, photo array, or in the course of giving a statement; and seeking to bolster the credibility of an incredible witness by using coercion and/or suggestion to extract a similar statement from another witness.

144.    These blatantly corrupt policies and practices were in prevalent use by the NYPD during the time when the Quintero murder was investigated and Mr. Fernandez was tried and convicted (1993 to 1996).  Indeed, they had been endemic for many years prior to that timeframe (and remained in use well after then).

145.    Numerous cases demonstrate that the use of unduly suggestive identification procedures and police misconduct were pervasive in homicide investigations by the NYPD around the time of the investigation of Quintero's murder.  There are too many to list here, but a few examples include the following:

(a)    In 1992, Fernando Bermudez was wrongfully convicted of murder for shooting a man outside of a nightclub in Greenwich Village.  A year after his conviction, all five eyewitness who identified Mr. Bermudez as the shooter at trial recanted.  Each witness swore that they were coerced or manipulated by the police to identify Mr. Bermudez.  Their false identifications were also a result of unduly suggestive photo array and line-up procedures.  Ultimately—after serving 18 years in prison for a crime he did not commit—Mr. Bermudez's conviction was vacated in 2009.

(b)    In 1992, Luis Kevin Rojas was wrongfully convicted of murder in connection with a shooting in Manhattan on the basis of faulty eyewitness identifications coordinated by the NYPD.   Although,

Mr. Rojas bore no resemblance to the 911 caller descriptions of the shooter, police officers arrested Mr. Rojas, directed him to change his jacket to fit the description of the shooter's jacket, and then brought him to the scene of the crime for show-up identifications. The next morning, the officers coordinated a line-up in which none of the fillers resembled Mr. Rojas.  In 1995, Mr. Rojas's conviction was overturned, and a jury subsequently found him not guilty in his criminal retrial.

(c)     In 1989, Bernie Pollard was wrongly arrested, imprisoned, and charged with a murder he did not commit.  Pollard had been arrested previously and was known to the police at the time of the crime.  He was implicated by two jailhouse informants who later tried to recant but were threatened with perjury if they went back on their false statements about Pollard.  An NYPD detective pressured another witness to select Pollard from a lineup, and the detectives failed to question an obvious suspect, the victim's partner with whom she had been feuding.  Pollard spent fifteen months imprisoned at Rikers Island before the charges were dropped.

(d)     Also in 1989, Derrick Deacon was convicted of a Brooklyn murder that he did not commit.  NYPD officers ignored evidence pointing to Deacon's innocence, including that he did not match the description of the perpetrator, and they instead pressured a witness into implicating Deacon in the crime.  Though the witness did not

wish to implicate Deacon, the police threatened her with the potential loss of custody over her children if she failed to cooperate with their false story of the crime. After his conviction was vacated, Deacon was retried but acquitted after just nine minutes of jury deliberation. He spent 24 years wrongfully imprisoned.

146. Other examples of such misconduct by the NYPD can be found in a report issued by the Conviction Review Unit ("CRU") of the Brooklyn DA's office in July 2020. Titled *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York*, the report examined the first 25 convictions identified by CRU since its inception in 2014. The report recognized that "[t]he magnitude of years lost to wrongful imprisonment" in the sample is "almost unbearable" given that "together, they add up to 426 years spent in prison."

147. Of the wrongful convictions examined in the CRU report, most occurred in the 1980s and 1990s and involved homicides. Nearly all of the exonerees were male and either Black or Latinx.

148. In 25 percent of the cases examined, the CRU concluded that the wrongful convictions involved unreliable identifications by eyewitnesses—including obvious limitations on the witness's ability to view the suspect, inconsistencies in the identification over time, and the use of in-court show ups, as well as likely police coaching as to whom the witness should select. The CRU identified three types of identification procedures for which such issues were rampant: photo arrays, lineups, and show-ups. The CRU concluded that a significant number of the lineups and photo arrays in those cases were not "double-blind" (*i.e.*, such that the officer administering the identification does not know who the suspect is) or did not use a "blended" approach to fillers (*i.e.*, selecting fillers similar in kind to the suspect and/or the witness's description of the culprit).

The CRU also identified instances in which show-up identifications were used even though there is no means of eliminating the risk of suggestiveness for such identifications.

149.    In addition, the CRU concluded that in certain cases NYPD officers "engaged in what appeared to be serious misconduct," including coaching witness identifications and even "directly suggest[ing] to witnesses whom to select," failing to provide exculpatory evidence to the prosecution, and providing false testimony in pretrial hearings.  In one instance, police showed a witness a photo array that included the "suspect" of a shooting—even though the suspect was actually incarcerated on the day of the shooting—and after the witness stated she could not identify the shooter, the detective nevertheless encouraged the witness to select the suspect by falsely telling her that other witnesses had already identified him.

150.    Further, in the cases examined by the CRU, more than 25 percent of the exonerees were found to have provided false confessions in response to either physical abuse or intense psychological coercion during the interrogation.   The CRU concluded in each of those cases that that law enforcement officers failed to scrutinize the confession for reliability and discarded evidence when it did not match their selected suspects.

151.    There are numerous other examples of homicide investigations in the late 1980s and 1990s in which NYPD officers used similar unlawful tactics to manufacture false testimony by witnesses.  In many of those cases, police officers also failed to disclose exculpatory evidence or follow obvious leads that would lead to another suspect.  Such wrongful convictions include those of Clifford Jones in 1981, Scott Fappiano in 1985, Rafael Ruiz in 1985, Anthony Faison in 1988, Barry Gibbs in 1988, Charles Shepherd in 1988, Derrick Deacon in 1989, William Lopez in 1989, Bernie Pollard in 1989, Mark Denny in 1989, Shabaka Shakur in 1989, Jonathan Fleming in 1990, Jeffrey Blake in 1991, Huwe Burton in 1991, Carlos Davis in 1991, Ruben Ortega

in 1991, John Dwayne Bunn in 1992, Derrick Hamilton in 1992, Rosean Hargrave in 1992, Sharrif Wilson and Antonio Yarbough in 1992, Reginald Connor and Everton Wagstaffe in 1993, Jose Garcia and Carlos Morillo in 1993, Ruddy Quezada in 1993, Jabbar Collins in 1994, Carlos Weeks in 1995, Hector Gonzalez in 1996, and Richard Rosario in 1998.  In all of these cases, these individuals had their convictions reversed or vacated after police misconduct came to light, and only after serving many years in prison.

152.    The investigation of Mr. Fernandez was conducted pursuant to the customs of misconduct outlined above, which were widespread throughout the NYPD.  Officer Melino, Detective Tebbens, Investigator Garcia and other Defendants used these same tactics to manufacture the fabricated case against Mr. Fernandez.

### Corruption in the 30th Precinct

153.    The City's custom, policy, or practice of misconduct in homicide investigations and other official activity is also documented in the 1994 report of the Mollen Commission, which was enacted in 1992 by the Mayor of New York City to investigate allegations of police corruption in the 30th Precinct and throughout the NYPD.  The 30th Precinct, which covers West Harlem, Hamilton Heights, and Sugar Hill in Manhattan's Upper West Side, became known as the "Dirty Thirty" based on the Mollen Commission's findings.

154.    The Mollen Commission found that a "*significant percentage* of the [30th] precinct routinely engaged in some form of corruption," and that "*numerous other officers* were complicit through their silence and protection of these corrupt cops."  The Mollen Commission's findings were based on the analysis of "thousands of [NYPD] documents and corruption case files pertaining to corruption" and "thousands of corruption complaints lodged at Internal Affairs over the past five years," as well as "over one hundred private hearings or informal interviews with current and former members of the [NYPD], including Internal Affairs officers of all ranks,"

"[s]cores of interviews . . . with law enforcement officers from a number of agencies including the District Attorneys' Offices, the United States Attorneys' Offices, the Federal Bureau of Investigation, the Drug Enforcement Administration and the Internal Revenue Service," interviews with "defense attorneys, criminal defendants, private citizens who resided in precincts suspected of corruption and criminal informants who claimed to have knowledge of police corruption," as well as confidential information provided by whistleblower police officers assigned to Internal Affairs and other commands.  The Mollen Commission also developed a confidential informant, working undercover and wearing a body recorder, who "confirmed that a number of police officers in the 30th Precinct were accepting payoffs from drug dealers in bodegas and various other storefront locations in the neighborhood."  Working with federal law enforcement agencies, the Mollen Commission also uncovered substantial evidence of corruption through the cooperation of civilians and officers facing criminal charges for their roles.

155.    Specifically, the Mollen Commission found that, in the 30th Precinct during the early 1990s, "a large group of cops worked in quasi-independent groups of three to five officers, each protecting and assisting the other's criminal activities."  Corruption by officers included faking emergency calls, conducting illegal raids, engaging in drug deals, negotiating protection for certain drug dealers in exchange for information on rival drug dealers, and stealing large amounts of cash.

156.    Officers in the 30th Precinct also developed a "highly organized method of regular protection payments from dealer to cop," in which "dealers would leave cash in brown paper bags for their police accomplices in neighborhood stores."  They "collected thousands of dollars a week each for protection—generally several hundred dollars from various small dealers

in exchange for immunity from arrest," and corrupt officers "often had their own regular group of 'friendly' dealers who would provide information about rival dealers."

157.    To cover up their corruption, officers in the 30th Precinct "falsified official reports and perjured themselves to conceal their misdeeds."   The types of perjury that NYPD officers routinely committed included:  "testimonial perjury, as when an officer testifies falsely under oath before a grand jury or at a court proceeding; documentary perjury, as when an officer swears falsely under oath in an affidavit or criminal complaint; and falsification of police records, as when an officer falsifies the facts and circumstances of an arrest in police reports."   Such practice was so common throughout the NYPD (and the 30th Precinct, specifically) that a new word was coined: "testilying."

158.    Similar corruption existed in other precincts—such as the 24th Precinct (the precinct to which Defendants Melino and Velez were initially assigned)—in Upper Manhattan during the 1990s.  For instance, Darrin Edmonds, a community police officer assigned to the 24th Precinct, was on the YTC payroll and told YTC leadership the names of witnesses, informants, and undercover officers, as well as other confidential law enforcement information.    At Mr. Fernandez's trial, for example, Mejias testified that Officer Edmonds had warned him that "the police were coming for [him]" approximately two months before he was arrested in 1994.  In October 1996, Officer Edmonds was arrested and charged with supplying confidential information to the YTC.  Prosecutors alleged that, in return for payoffs, Officer Edmonds would tip off YTC members as to upcoming drug raids, provide them with identifies of undercover officers, and had even removed a photograph of a YTC member from the 24th Precinct station.  In April 1997, Officer Edmonds pleaded guilty to attempted conspiracy and admitted that he was a paid employee of the YTC and was sentenced to three years of imprisonment.

159.    Ultimately, the Mollen Commission concluded that police corruption in Upper Manhattan was a "serious problem"  that had become "more serious and threatening than ever before."  The Commission found that this police corruption flourished as a result of "a police culture that exalts loyalty over integrity; because of the silence of honest officers who fear the consequences of 'ratting' on another cop no matter how grave the crime; because of willfully blind supervisors who fear the consequences of a corruption scandal more than corruption itself; because of the demise of the principle of accountability that makes all commanders responsible for fighting corruption in their commands; because of a hostility and alienation between the police and community in certain precincts which breeds an 'Us versus Them' mentality; and because for years the New York City Police Department abandoned its responsibility to insure the integrity of its members."

**FEDERAL CLAIMS**

**First Claim for Relief**
**42 U.S.C. § 1983 Fifth and Fourteenth Amendment**
**Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial**
**(Defendant officers Melino, Tebbens, Garcia, Mshar, Parson, Does #1-12)**

160.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 159 above as if fully set forth here.

161.    Defendant officers and investigators Melino, Tebbens, Garcia, Mshar, Parson and/or Does #1–12, acting individually and/or in concert, as well as under color of state law and within the scope of their employment, deprived Plaintiff Pablo Fernandez of his clearly established constitutional right of due process and a fair trial.

**A.**    ***Fabrication of Inculpatory Evidence***
        ***(Defendant officers Melino, Tebbens, Garcia, Mshar, Does #1-12)***

162.    In the manner described more fully above, defendant officers deprived Plaintiff Fernandez of his constitutional rights by deliberately fabricating inculpatory evidence

against Mr. Fernandez, including without limitation by fabricating witness statements from Hickliff Rosario, George Rosario, Jesus Canela, Manuel Medina, Martin Mejias, and Raymond Rivera, and fabricating George Rosario's, Hickliff Rosario's, Manuel Medina's, and Jesus Canela's false identifications of Pablo Fernandez, thereby depriving Mr. Fernandez of his right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, not to be deprived of liberty without due process of law, and to a fair trial.  These fabrications were each used against Mr. Fernandez to cause his arrest, pre-trial incarceration, prosecution, conviction, and wrongful incarceration.

163.    Specifically, and without limitation, Defendant officers Melino, Tebbens, Garcia, Mshar, and/or Does #1–12 fabricated and/or coerced a false identification of Pablo Fernandez from George Rosario and Hickliff Rosario, wherein they:

> (a)    repeatedly showed George and Hickliff Rosario a photograph of Mr. Fernandez and told them that Mr. Fernandez was the shooter and/or guilty of the Quintero homicide;
>
> (b)    pressured or coerced George and Hickliff Rosario to identify Mr. Fernandez in the photo array; and
>
> (c)    pressured or coerced George and Hickliff Rosario to identify Mr. Fernandez in a lineup and/or in court.

164.    Specifically, and without limitation, Defendant officers Melino, Tebbens, and/or Does #1–12 fabricated and/or coerced a false identification of Pablo Fernandez from Jesus Canela, wherein they:

> (a)    showed Canela a photograph of Mr. Fernandez's and told him that Mr. Fernandez was the shooter;

        (b)      pressured or coerced Canela to identify Mr. Fernandez as the shooter, despite the fact that Canela indicated several times that he could not identify Mr. Fernandez as the shooter;

        (c)      told Canela where Mr. Fernandez would be sitting in court and pressured or coerced Canela to identify Mr. Fernandez in court; and

        (d)      told Canela not to disclose their improper tactics.

165.    Specifically, and without limitation, Defendants Melino, Tebbens, Mshar, and/or Does #1–12 fabricated and/or coerced statements and evidence falsely implicating Mr. Fernandez in the Quintero homicide from government cooperators Martin Mejias and Raymond Rivera.

166.    Defendants, including Melino, Tebbens, Garcia, Mshar, Parson and Does #1-12, furthermore deprived Pablo Fernandez of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to investigate, and/or in the alternative suppressing the results of the investigation, witnesses and evidence which would have supported Pablo Fernandez's innocence as described further above.

167.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Fernandez's constitutional rights and innocence.  No reasonable officer in 1993–1996 would have believed this conduct was lawful.

168.    Pablo Fernandez is completely innocent of the murder of Ramon Quintero. The prosecution finally terminated in Mr. Fernandez's favor on September 13, 2019, when the indictment was finally dismissed following the vacation of his conviction on May 16, 2019.

169.    As a direct and proximate cause of Defendants' actions, Pablo Fernandez was indicted, tried, wrongly convicted and imprisoned for almost 25 years and suffered the other grievous damages and injuries set forth above.

**B.    Unduly Suggestive Identification Procedures**
      **(Defendants Melino, Tebbens, Garcia, Mshar, Does #1-12)**

170.    Defendant officers Melino, Garcia, Mshar, and/or Does #1–12 induced and coerced George Rosario to falsely identify Pablo Fernandez, using improper methods such as repeatedly emphasizing a particular suspect, and using suggestion during the lineup to obtain Fernandez's identification.

171.    Defendant officers Melino, Garcia, Mshar, and/or Does #1–12 induced and coerced Hickliff Rosario to falsely identify Pablo Fernandez, using improper methods such as repeatedly emphasizing a particular suspect, and using suggestion during the lineup to obtain Fernandez's identification.

172.    Defendant officers Melino, Tebbens, and/or Does #1–12 induced and/or coerced Jesus Canela to falsely identify Pablo Fernandez, using improper methods such as pointing at a specific photograph to obtain Fernandez's identification, and using improper suggestion prior to his in-court identification of Mr. Fernandez.

173.    Defendant officers Melino, Tebbens, and/or Does #1–12 fabricated and/or coerced Manuel Medina to falsely identify Pablo Fernandez, using improper suggestion before his in-court identification of Mr. Fernandez.

174.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Fernandez's constitutional rights and innocence.  No reasonable officer in 1993-1996 would have believed this conduct was lawful.

175. As a direct and proximate cause of Defendants' actions, Pablo Fernandez was indicted, tried, wrongly convicted and imprisoned for almost 25 years and suffered the other grievous damages and injuries set forth above.

**C.** **Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution (Defendants Melino, Tebbens, Garcia, Mshar, Parson, Does #1-12)**

176. Defendant officers Melino, Garcia, Tebbens, Mshar and/or Does #1–12 suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation:

(a) that George Rosario, Hickliff Rosario, and Jesus Canela stated that Mr. Fernandez was not the shooter or that they could not identify Mr. Fernandez as the shooter;

(b) that Raymond Rivera was incarcerated in upstate New York and could not have seen Mr. Fernandez in Manhattan in the days leading up to the Quintero homicide;

(c) that Rivera and Martin Mejias had been instructed to give false testimony about Mr. Fernandez at his trial;

(d) that Mejias had stated that Rivera was lying in Mr. Fernandez's case;

(e) that Henry Gomez was shown a photograph of Mr. Fernandez and failed to identify him as the shooter; and

(f) the Defendants' own misconduct and the misconduct of other officers in procuring false statements and evidence from George Rosario, Hickliff Rosario, Manuel Medina, Jesus Canela, Raymond Rivera, and Martin Mejias in Mr. Fernandez's case.

177.    Defendant officers Melino, Parson, and/or Does #1–12  suppressed material exculpatory and impeachment information from the prosecution and defense, including their own misconduct and/or crimes not related to Mr. Fernandez's case.

178.    Defendant officers Melino, Tebbens, Garcia, Parson, Mshar and Does #1–12, acting individually and in concert, ignored the facts in front of them and failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Pablo Fernandez's prosecution.

179.    The deliberate and reckless investigative failures of the Defendants included, but were not limited to: failure to investigate obvious leads, including descriptions of the shooter, names, and license plate numbers from eyewitnesses; failure to investigate or interview other known or easily known eyewitnesses, including the second victim of the shooting; and failure to conduct any adequate investigation into allegations of police misconduct in Mr. Fernandez's case.

180.    Defendants performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Fernandez's constitutional rights and innocence.  No reasonable officer in 1993-1996 would have believed this conduct was lawful.

181.    Pablo Fernandez is completely innocent of the murder of Ramon Quintero. The prosecution finally terminated in Mr. Fernandez's favor on September 13, 2019, when the indictment was finally dismissed following the vacation of his conviction on May 16, 2019.

182.    As a direct and proximate cause of Defendants' actions, Pablo Fernandez was indicted, tried, wrongly convicted, and imprisoned for almost 25 years and suffered the other grievous damages and injuries set forth above.

**Second Claim for Relief**
**42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution**
**(Defendant officers Melino, Tebbens, Garcia, Mshar, Does #1-12)**

183.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 182 above as if fully set forth here.

184.    Defendant officers Melino, Tebbens, Garcia, Mshar, and/or Does #1–12, with malice and knowing that probable cause did not exist to arrest Pablo Fernandez and prosecute him for the murder of Manny Quintero, acting individually and in concert, caused Pablo Fernandez to be arrested, charged, and prosecuted for that crime, thereby violating Pablo Fernandez's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

185.    Specifically, Defendant officers Melino, Tebbens, Garcia, Mshar, and/or Does #1–12, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Pablo Fernandez, including but not limited to the facts that George Rosario's, Hickliff Rosario's, and Jesus Canela's statements and identification of Pablo Fernandez were fabricated by the Defendants and the product of improper and unduly suggestive identification procedures, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence which Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Pablo Fernandez.

186.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Fernandez's clearly established constitutional rights.  No reasonable officer in 1993–1996 would have believed this conduct was lawful.

187.    Pablo Fernandez is completely innocent of the murder of Ramon Quintero. The prosecution finally terminated in Mr. Fernandez's favor on September 13, 2019, when the indictment was finally dismissed following the vacation of his conviction on May 16, 2019.

188.    As a direct and proximate result of Defendants' actions, Mr. Fernandez was wrongly convicted and imprisoned for nearly 25 years and suffered the other grievous and continuing damages and injuries set forth above.

**Third Claim for Relief**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
**(Defendant officers Melino, Tebbens, Garcia, Does #1-12)**

189.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 188 above as if fully set forth here.

190.    Defendant officers Melino, Tebbens, Garcia and/or Does #1–12, acting within the scope of their employment and under color of state law, agreed among themselves and other individuals—including Martin Mejias and Raymond Rivera—to act in concert in order to deprive Mr. Fernandez of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial and fair pretrial proceedings.

191.    In furtherance of the conspiracy Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

(a)    fabricating inculpatory evidence in reports and pretrial communications with the prosecution, including the purported independent identification of Mr. Fernandez;

(b)     wrongfully arresting and causing the conviction and incarceration of Mr. Fernandez, knowing that they lacked probable cause;

(c)     suborning and committing perjury during hearings and trials;

(d)     intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case;

(e)     failing to follow up or investigate the evidence of the true perpetrators of the Quintero murder and of Mr. Fernandez's innocence; and

(f)     thereafter suppressing and covering up evidence of their. wrongdoing in all of the foregoing respects for a long period of time, while Mr. Fernandez remained in prison for a crime they knew he did not commit.

192.    Pablo Fernandez is completely innocent of the murder of Ramon Quintero. The prosecution finally terminated in Mr. Fernandez's favor on September 13, 2019, when the indictment was finally dismissed following the vacation of his conviction on May 16, 2019.

193.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Fernandez's constitutional rights and innocence. No reasonable officer in 1993–1996 would have believed this conduct was lawful.

194.    As a direct and proximate result of Defendants' actions, Mr. Fernandez was wrongly convicted and imprisoned for almost 25 years and suffered the other grievous and continuing damages and injuries set forth above.

**Fourth Claim for Relief**
**42 U.S.C. § 1983 Failure to Intercede**
**(Defendant officers Melino, Tebbens, Garcia, Does #1-12)**

195.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 194 above as if fully set forth here.

196.    By their conduct and under color of law, Defendant officers Melino, Tebbens, Garcia, and/or Does #1–12, had opportunities to intercede on behalf of Pablo Fernandez to prevent his malicious prosecution, and the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

197.    The Defendant officers' failures to intercede violated Pablo Fernandez's clearly established constitutional rights, including but not limited to his right not to be deprived of liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments.

198.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Pablo Fernandez's constitutional rights and innocence.  No reasonable officer in 1993–1996 would have believed this conduct was lawful.

199.    As a direct and proximate result of Defendants' actions Pablo Fernandez was indicted, tried, wrongly convicted and imprisoned for almost 25 years and suffered the other grievous damages and injuries set forth above.

**Fifth Claim for Relief**
**U.S.C. § 1983 Supervisory Liability**
**(Defendant supervisors Mshar, Quinn, Does #11-12)**

200.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 199 above as if fully set forth here.

201.    The individual defendant police officers and/or detectives, Melino, Tebbens, Garcia, Parson, and Does #1–10, acted with impunity in an environment in which they were not adequately supervised or disciplined by Defendants Mshar, Quinn and  Does #11–12, who were supervisors, in this case and as a matter of practice.

202.    Defendants Mshar, Quinn, Does #11–12, and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate supervision and discipline of the defendant police officers and detectives and thereby caused the individual defendant police officers and detectives to deprive Pablo Fernandez of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

203.    Had Defendants Mshar, Quinn, Does #11–12, and other supervisors not provided grossly inadequate supervision and discipline of defendant officers and detectives, those defendants would not have used unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications of Pablo Fernandez; fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Pablo Fernandez to be arrested and prosecuted without probable cause.   Defendants Mshar, Quinn, Does #11–12, and other supervisors and other supervisors were directly involved in the investigation of Pablo Fernandez and directly supervised the investigative acts taken by the individual officer and detective defendants in this case.

204.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Mshar, Quinn, Does #11-12 and other supervisors under color of state law violated their clearly established constitutional duty, in 1993–1996, to supervise Defendant officers Melino, Tebbens, Garcia, Parson, and Does #1–10, and no reasonable police supervisor in in 1993–1996 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

205.    As a direct and proximate result of Defendants' actions, Pablo Fernandez was wrongly convicted and imprisoned for nearly 25 years and suffered the other grievous and continuing damages and injuries set forth above.

## Sixth Claim for Relief
### 42 U.S.C. § 1983 *Monell* Claim
### (Defendant City of New York)

206.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 205 above as if fully set forth here.

207.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Mr. Fernandez, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise and discipline NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to using police informants/witnesses, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to come forward with exonerating evidence.

208.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Mr. Fernandez, the NYPD, by and through its final policymakers, maintained a

policy, custom, or pattern and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques in serious felony investigations, including but not limited to the following: (a) the use of unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; (b) the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false statements and false identifications; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (e) the intentional failure to conduct adequate investigations of crimes; and (f) engaging in the affirmative concealment and cover up of these types of misconduct.

209.    The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to adequately supervise and discipline NYPD detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple NYPD detectives in relation to multiple witnesses in the investigation of Mr. Fernandez, as described above, as well as by other incidents and the findings of the Mollen Commission identified in paragraphs 133 to 159, above.

210.    The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and discipline was also reflected in numerous prior cases and investigations which, upon information and belief, were known to the NYPD supervisors and policymakers prior to and during the Quintero homicide investigation. The misconduct committed in those cases was actually or constructively known to NYPD supervisors and policymakers prior to and during the Quintero homicide investigation, and, upon information and belief, NYPD supervisors and policymakers failed to supervise, discipline, or otherwise remediate detectives and

officers in response to such notice or make any meaningful investigation into the above practices and techniques. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants such as Pablo Fernandez.

211.    The foregoing customs, policies, practices, procedures of the City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiff Pablo Fernandez.

212.    The foregoing customs, policies, practices, procedures of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff Pablo Fernandez as alleged herein.

213.    The foregoing customs, policies, practices, procedures of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by Plaintiff Pablo Fernandez as alleged herein.

214.    Such unconstitutional municipal customs, practices and/or policies caused Pablo Fernandez's arrest, prosecution, and nearly 25 years of incarceration, as well as all the other grievous injuries and damages set forth above.

### STATE CLAIMS

### <u>Seventh Claim for Relief</u>
**Malicious Prosecution**
**(Defendant officers Melino, Tebbens, Garcia, Mshar, Does #1-12)**

215.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 214 above as if fully set forth here.

216.    Defendant officers Melino, Tebbens, Garcia, Mshar, and/or Does #1-12, intentionally, recklessly, and with malice, and despite knowing that probable cause did not exist to arrest and prosecute Pablo Fernandez for the murder of Manny Quintero, acting individually

and in concert, caused Pablo Fernandez to be arrested, charged, prosecuted, and convicted for the Quintero murder.

217.   Specifically, Defendant officers Melino, Tebbens, Garcia, Mshar, and/or Does #1-12, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Pablo Fernandez, including but not limited to the facts that:  George Rosario's, Hickliff Rosario's, and Jesus Canela's statements and identification of Pablo Fernandez were fabricated by the Defendants and the product of improper and unduly suggestive identification procedures, and wholly unreliable; that Martin Mejias's and Raymond Rivera's statements and evidence were fabricated and coerced by the Defendants; and that those factors as well as additional material exculpatory and impeachment evidence which Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Pablo Fernandez.

218.   In addition, the Defendant officers, with malice, acting individually and in concert, intentionally and knowingly, deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Pablo Fernandez, including but not limited to facts that:  George Rosario, Hickliff Rosario, and Jesus Canela stated that Mr. Fernandez was not the shooter or could not identify him as the shooter; the Defendants fed George Rosario, Hickliff Rosario, Jesus Canela, Martin Mejias, and Raymond Rivera facts they believed to be true about the crime and told them that Mr. Fernandez was the shooter or otherwise guilty of the crime; Raymond Rivera was incarcerated in upstate New York and could not have seen Mr. Fernandez in Manhattan in the days leading up to the Quintero homicide; and Martin Mejias stated that Rivera was lying in Mr. Fernandez's case.

219.   Pablo Fernandez is innocent of the murder of Manny Quintero.   Mr. Fernandez's cause of action for malicious prosecution was unavailable to him until his prosecution finally terminated in his favor on September 13, 2019, when the indictment was finally dismissed following the vacation of his conviction on May 16, 2019.

220.   Defendants engaged in these acts within the scope of their employment.

221.   As a direct and proximate result of Defendants' actions, Pablo Fernandez was wrongly convicted and imprisoned for almost 25 years and suffered the other grievous damages and injuries set forth above.

**Eighth Claim for Relief**
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
**(Defendant officers Melino, Tebbens, Garcia, Mshar, Does #1-12)**

222.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 221 above as if fully set forth here.

223.   The improper, deliberate, and traumatizing conduct of Defendant officers Melino, Tebbens, Garcia and/or Does #1-12, during the investigation of Pablo Fernandez, as well as their conduct in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

224.   In the alternative, Defendant officers Melino, Tebbens, Garcia and/or Does #1-12, negligently and grossly negligently, and in breach of their duties owed to Pablo Fernandez to, *inter alia*, report accurately the information given by witnesses and the circumstances underlying such statements; refrain from conducting unduly suggestive identification procedures and report accurately what occurred during identification procedures; refrain from fabricating

evidence and withholding material exculpatory and impeachment evidence, and otherwise acting to deny Pablo Fernandez due process of law, directly and proximately caused Mr. Fernandez, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than two decades. Defendants' actions unreasonably endangered Mr. Fernandez's physical and mental health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pre-trial and post-conviction incarceration.

225.    Defendants engaged in these acts within the scope of their employment.

226.    These claims are tolled as Defendants concealed from Mr. Fernandez—and still are concealing to this day—their conduct giving rise to this cause of action.

### Ninth Claim for Relief
### Supervisory Negligence
### (Defendant supervisors Mshar, Quinn, Does #11–12)

227.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 226 above as if fully set forth here.

228.    Defendants Mshar, Quinn and Does #11–12 were grossly negligent and negligent in the supervision and discipline of Defendant officers Melino, Tebbens, Garcia, Parson, and Does #1–10.

229.    Defendants Mshar, Quinn and Does #11–12 knew or, but for their grossly negligent and negligent supervision and discipline, should have known that of Defendant officers Melino, Tebbens, Garcia, Parson, and Does #1–10, engaged in investigative misconduct including fabricating evidence, conducting unduly suggestive identification procedures, and failing to document and disclose material, exculpatory and impeachment evidence, and that they thereby caused Mr. Fernandez to be maliciously prosecuted and arrested.

230.    As a direct and proximate result of the gross negligence and negligence of Defendants Mshar, Quinn and Doe #11–12, Defendant officers Melino, Tebbens, Garcia, Parson, and Does #1–10 engaged in the previously set forth misconduct and caused the above-described acts of malicious prosecution, violation of due process, intentional and/or reckless infliction of emotional distress, and negligent infliction of emotional distress, thereby directly and proximately causing Mr. Fernandez's wrongful conviction and nearly 25 years of wrongful imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

### Tenth Claim for Relief
*Respondeat Superior*
**(Defendant City of New York)**

231.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 230 above as if fully set forth here.

232.    At all times relevant to this Complaint, Defendant officers Melino, Tebbens, Garcia, Mshar, and Does #1-12, acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with City of New York.

233.    The conduct by which the Defendant officers committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Defendant officers' personal motives, but rather was undertaken while the Defendant officers were on duty, carrying out their routine investigative functions as detectives and police officers.

234.    Under the doctrine of *respondeat superior*, the City of New York is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests judgment against Defendant as follows:

(a)    That the Court award compensatory damages to Plaintiff and against the Defendants, jointly and severally, in an amount to be determined at trial;

(b)    That the Court award punitive damages to Plaintiff, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

(c)    For a trial by jury;

(d)    For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)    For any all other relief to which the Plaintiff may be entitled.

Dated:  New York, New York

  December 11, 2020


    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

   By: _s/ David W. Brown_
    David W. Brown (dbrown@paulweiss.com)
    Daniel J. Beller
    Lynn Bayard
    Arianna Markel

    1285 Avenue of the Americas
    New York, New York 10019-6064
    Telephone: (212) 373-3020
    Fax: (212) 492-0020

   NEUFELD SCHECK & BRUSTIN, LLP
    Barry Scheck
    Nick Brustin
    Emma Freudenberger

    99 Hudson Street
    8th Floor
    New York, NY 10013

   _Counsel for Plaintiff Pablo Fernandez_